## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**SARAH PERRON**                                                                  **CIVIL ACTION**

**VERSUS**

**JEFF TRAVIS, ET AL.**                                              **NO. 20-00221-BAJ-EWD**

### RULING AND ORDER

On April 12, 2019, Myron Flowers was shot and killed by two law enforcement officers during a traffic stop for a failed license plate light. In this action, Flowers' daughter seeks damages from the officers that shot him—Deputy Sheriff Cullen Wilson of the East Feliciana Parish Sheriff's Office ("EFPSO"), and Sergeant Richard Baudoin of the Town of Clinton Police Department ("Clinton PD")—as well as their employers, the EFPSO and the Clinton PD, respectively. Now Deputy Wilson and the EFPSO (collectively, the "Sheriff Defendants"), and the Clinton PD each move for summary judgment, arguing that Plaintiff has failed to produce evidence to support her remaining constitutional claims of excessive force and inadequate training, and her various related state-law claims.[1] Plaintiff opposes Defendants' motions.

For the following reasons, Defendants' motions will each be granted in part: Plaintiff's municipal liability claim under *Monell v. Dep't of Soc. Servs. of City of New*

---

[1] The Clinton PD and Sergeant Baudoin are each represented by the same attorneys, yet Sergeant Baudoin does *not* move for summary judgment. Presumably, this is because he died in May 2021, seventeen months before the dispositive motion deadline. (Doc. 74). To date, Plaintiff's efforts to substitute a successor in Sergeant Baudoin's place have failed. (*See* Doc. 109, Doc. 122, Doc. 127). The Court has afforded Plaintiff one more opportunity to properly serve and substitute Sergeant Baudoin's heirs, and will consider that issue separately. (*See* Doc. 124, Doc. 125, Doc. 127, Doc. 128).

1

*York*, 436 U.S. 658 (1978) against the Clinton PD will be dismissed with prejudice; Plaintiff's municipal liability claim against the EFPSO will be dismissed in part, *to the extent* Plaintiff contends that the EFPSO failed to maintain an excessive force policy; in all other respects, Defendants' motions will be denied.

## I.    BACKGROUND

### A. Summary Judgment Evidence

The facts set forth below are drawn from the parties' competing statements of material fact,[2] and the competent summary judgment evidence submitted in support of these pleadings.

#### i.    Undisputed: The Events Before And After The Shooting

This much is undisputed. At approximately 9:30 p.m. on April 12, 2019, Deputy

---

[2] Defendants urge the Court to disregard entirely Plaintiff's opposing statements of material fact, and to deem admitted all facts set forth in their original statements of material fact, due to counsel's flagrant failure to conform Plaintiff's opposition papers to this Court's Local Rules. (Doc. 99 pp. 1-2; Doc. 108 pp. 1-2). Certainly, this option is available to the Court. *E.g.*, *Transportation & Logistical Servs., Inc. v. H & E Equip. Servs., Inc.*, No. 21-cv-00118, 2022 WL 842858, at *1 n.1 (M.D. La. Mar. 21, 2022) (Jackson, J.) (deeming plaintiff's proposed uncontested material facts admitted under Local Rule 56(f) where defendant failed to submit an opposing statement of material facts meeting the requirements of Local Rule 56(c)). Arguably, it is appropriate here, particularly because Plaintiff's counsel submitted a virtually identical (non-conforming) opposition to the Sheriff Defendants' summary judgment papers one week *after* the Clinton PD filed its reply memorandum specifically identifying these deficiencies, (*see* Doc. 99; *compare* Doc. 103-2 *with* Doc. 93-2), and even to this day counsel has not attempted to fix her original errors. Under almost any other circumstances, there would be harsh consequences for counsel's failures.

But this case is different. Myron Flowers is dead, and not here to tell his side of the story. Interests of justice demand a review of the competent evidence submitted in support of Plaintiff's serious claims, and the Court will not allow counsel's shortcomings to short-circuit its adjudicatory role. Accordingly, the Court has conducted an independent review of the summary judgment evidence, and sets forth that evidence above. *E.g.*, *Berry v. Williams*, No. CV 20-599-SDD-RLB, 2022 WL 2073079, at *5 (M.D. La. May 23, 2022) (Bourgeois, M.J.) (exercising discretion to review plaintiff's evidence submitted in support of his excessive force claim despite plaintiff's failure to conform his summary judgment opposition to Local Rule 56), *adopted*, 2022 WL 2070884 (M.D. La. June 8, 2022) (Dick, C.J.).

Wilson was patrolling Clinton, Louisiana, when he observed a tan Chevrolet Tahoe driving with a failed license plate light. (Doc. 86-2 ¶ 2, *hereinafter* "Sheriffs' SOF"). Deputy Wilson initiated a traffic stop, and the Tahoe's driver—non-party Kyle Bryant—pulled over into the parking lot of RKM Primary Care, a medical clinic. (*Id.* ¶ 3). Deputy Wilson parked his patrol unit seven to ten feet directly behind the Tahoe. (Doc. 86-4 p. 31:14-18, *hereinafter* "Wilson Depo.").

Deputy Wilson got out, approached the Tahoe's driver door, recognized Bryant from prior encounters, and asked him to step out and come to the back of the truck so that he could see the failed license plate light. (Sheriffs' SOF ¶ 5). Bryant complied. Along the way, Deputy Wilson further informed Bryant that he smelled marijuana. (Wilson Depo. p. 29:20-22). Bryant denied possessing marijuana, and consented to a search of the Tahoe. (Sheriffs' SOF ¶ 7). Deputy Wilson also frisked Bryant, revealing no contraband. (Wilson Depo. p. 30:7-9).

At about this time, Sergeant Baudoin arrived at the scene, and parked his patrol unit at a diagonal position to Deputy Wilson's unit. (Sheriffs' SOF ¶ 8). Sergeant Baudoin conferred with Deputy Wilson, and then assisted by taking control of Bryant as Deputy Wilson searched the Tahoe. Sergeant Baudoin relocated Bryant to the far (passenger) side of Deputy Wilson's unit, and remained there with Bryant during the duration of Deputy Wilson's vehicle search. (*Id.* ¶ 9).

Deputy Wilson's search of the Tahoe began in the driver's compartment, where he opened the center console. (Sheriffs' SOF ¶¶ 10-11). The console lid came off its hinge, and fell to the rear passenger compartment. (*Id.* ¶ 11). Tracing the console lid's

3

trajectory, Deputy Wilson unexpectedly saw "a leg." (Wilson Depo. p. 36:13). Wilson "immediately quit searching the vehicle and opened the … back left passenger door" revealing Myron Flowers, who was sitting directly behind the driver's seat. (*Id.* p. 36:13-15).

In the next 13 seconds, Deputy Wilson and Sergeant Baudoin collectively shot Flowers seven times. (Doc. 93-4 pp. 9-10; *see* Sheriffs' SOF ¶¶ 24, 27, 28). When he emerged from the Tahoe, Flowers immediately fell, and died on the ground in the RKM parking lot. Crime scene investigators later recovered two loaded firearms located near Flowers' body—a .38 caliber revolver, and a 9mm semiautomatic pistol, (Sheriff's SOF ¶ 31)—but found no evidence indicating that either weapon had been fired. (Doc. 86-6 p. 7).

After the shooting, the Louisiana State Police (LSP) and the EFPSO conducted a joint criminal investigation to determine whether probable cause supported criminal charges against Deputy Wilson and Sergeant Baudoin. (Sheriffs' SOF ¶¶ 32-34). This investigation included observing the scene and gathering physical evidence in the immediate aftermath of the shooting; taking unsworn, recorded, custodial interviews of Deputy Wilson, Sergeant Baudoin, and Bryant in the days to follow; obtaining security camera video footage of the traffic stop from RKM Primary Care; and reviewing Flowers' autopsy report. (*See* Doc. 86-6 pp. 5-9). On April 15, 2019— three days after the shooting—the LSP issued its investigation report, finding (1) Deputy Wilson "fired his service handgun toward Flowers five times, striking Flowers several times"; (2) Sergeant Baudoin "fired his service handgun twice toward Flowers,

striking him in the left shoulder"; and (3) "Flowers succumbed at the scene to wounds caused by the gunfire." (*Id.* p. 10). Still, the LSP concluded that "[n]o evidence was discovered or developed … that established probable cause to move forward with criminal charges." (*Id.*).

Deputy Wilson was placed on paid "administrative leave pending investigation of the shooting," but was not suspended and did not face any other disciplinary measures. (Wilson Depo. p. 65:11-17; *see also* Doc. 86-8 p. 99:13-22). The EFPSO "welcom[ed] him back" after the LSP concluded its investigation. (Doc. 86-8 p. 99:13-22). Similarly, the Clinton PD immediately placed Sergeant Baudoin on a mandatory 14-day paid administrative leave following the shooting. (Doc. 82-6 pp. 34:25-35:7). However, unlike Deputy Wilson, Sergeant Baudoin was *not* allowed to return to work after his paid leave expired, and he resigned from the Clinton PD approximately one month after the shooting. (Doc. 82-6 pp. 34:14-22). At his deposition, Clinton PD Chief Ned Davis affirmed that Sergeant Baudoin was "suspend[ed]" for his involvement in "the shooting of Myron Flowers." (*Id.* p. 35:1-7).

At the time the officers shot Flowers, the EFPSO maintained a policy prohibiting "unnecessary force or violence," which provided:

6. UNNECESSARY FORCE OR VIOLENCE.

Every member of the [EFPSO] must refrain from using unnecessary force or violence and shall not strike a prisoner or any other person except in self-defense.

(Sheriffs' SOF ¶¶ 36-37). Yet, despite this policy, Deputy Wilson stated at his deposition that he was *not* trained in the use of excessive force:

Q. … Are you trained in the use of excessive force?

5

A. No, ma'am.

…

Q. And you said, "No, ma'am?"

A. No, ma'am.

(Wilson Depo. pp. 16:16-23).

Similarly, when the shooting occurred, the Clinton PD maintained a policy establishing "[p]arameters for use of deadly force," which provided:

1. Police officers are authorized to use deadly force in order to:

> a. Protect the police officer or others from what is believed [sic] reasonably believed to be  threat [sic] of death or serious bodily harm.

(Doc. 82-2 ¶¶ 23-24, *hereinafter* "Town SOF"). At his deposition, Chief Davis testified that all Clinton PD officers are required to participate in an annual defensive tactics training course, which includes training on the use of excessive force. (Town SOF ¶ 28).

### ii.  Disputed: The 13 Seconds Surrounding The Shooting

As stated, the foregoing facts are undisputed, and supported by competent summary judgment evidence. But the devil is in the details—here, the blur of events that occurred in the 13 seconds between when Deputy Wilson opened the Tahoe's rear door, and when Flowers lay expiring in the RKM parking lot. Despite four witnesses having been at the scene for this critical interval—Deputy Wilson, Sergeant Baudoin, Bryant, and Flowers—only two competent accounts are included in the summary judgment record: Deputy Wilson's deposition testimony; and a real-time video recorded by a security camera mounted to RKM's wall, "in which the entire incident

6

was captured."[3] (Doc. 82-2 ¶ 22; *accord* Doc. 86-2 ¶ 30). The U.S. Court of Appeals for the Fifth Circuit instructs that "we assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene." *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) (citing *Scott v. Harris*, 550 U.S. 372 (2007)). Accordingly, the Court describes what is depicted in the RKM security video first.

Unfortunately, the security video does not offer a clear picture of what occurred in those fateful 13 seconds. The version provided to the Court lacks audio, and the picture quality is poor—grainy, low-lit, and repeatedly flooded by blue-light

---

[3] Defendants' summary judgment papers also cite extensively to the unsworn, recorded statements provided by Deputy Wilson, Sergeant Baudoin, and Bryant during the LSP's investigation into Flowers' death, purportedly to show that Deputy Wilson and Sergeant Baudoin acted reasonably during their encounter with Flowers. (*See* Doc. 82-8 ¶ 2; Doc. 86-5 ¶ 2). The "gist" of these statements is also transcribed in the LSP investigation report. (Doc. 82-4 pp. 3-5). The problem with this evidence is obvious: these statements are unsworn, *and* they are hearsay. Absent *any* briefing from Defendants regarding the admissibility of these statements, the Court will not consider them for present purposes. *Bellard v. Gautreaux*, 675 F.3d 454, 461 (5th Cir. 2012) (district court may *sua sponte* exclude hearsay evidence at summary judgment even in the absence of any objection or briefing by the opposing party); *see Manis v. Lawson*, 585 F.3d 839, 844 n.3 (5th Cir. 2009) ("Third party statements included in a police report are not admissible under the public records exception to the hearsay rule."); *e.g.*, *Okoye v. Univ. of Texas Houston Health Sci. Ctr.*, 245 F.3d 507, 515 (5th Cir. 2001) (refusing to consider witness's unsworn statement at summary judgment because it did not comply with the requirements of Rule 56 and, thus, was "not competent summary judgment evidence"); *Harper v. McAndrews*, 499 F. Supp. 3d 312, 318 (E.D. Tex. 2020) (the prior statement of a dead person, even if sworn, "may not be considered on a motion for summary judgment" (citing authorities)); *Goldston v. City of Fort Worth*, No. 17-cv-105, 2017 WL 11349538, at *6 (N.D. Tex. Nov. 1, 2017) (Means, J.) (audio recordings of witness statements made during a police interview were "not admissible for proof of their substance, inasmuch as [the] statements on the audio recording are hearsay" (citing authorities)), *aff'd*, 775 F. App'x 772 (5th Cir. 2019).

In any event, the Court's analysis would not change even if these additional statements were taken into account because they are cumulative of Deputy Wilson's sworn deposition testimony, and the rules of summary judgment prohibit the Court from weighing the evidence to "determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

interference from the officers' patrol units. (Doc. 82-8 ¶ 2 (Attachment 7), *hereinafter* "RKM Video").[4] What it shows is this: Approximately two minutes and fifteen seconds into the traffic stop—after Sergeant Baudoin arrived and took control of Bryant— Deputy Wilson returns to the Tahoe's driver door with a flashlight in his right hand, opens it, and leans inside. (*Id.* 02:16-2:35). Twenty seconds pass, and Deputy Wilson emerges, opens the rear driver side door, reaches inside, and appears to engage in a struggle. (*Id.* 2:35-2:40). Notably, for this portion of the video, Flowers is entirely obscured by the open rear door. (*Id.*). After six or seven seconds, Deputy Wilson drops his flashlight, raises his service weapon in his right hand, retreats rapidly from the Tahoe, and fires multiple shots (evidenced by muzzle flashes). (*Id.* 02:40-02:47). Flowers emerges from the truck, and appears to raise both arms, before falling to the ground, and rolling over. (*Id.* 02:46-02:51). As Flowers rolls he appears to bring his hands together and raise his arms again, and Deputy Wilson *and* Sergeant Baudoin each fire more shots (again, evidenced by muzzle flashes). (*Id.* 02:40-02:50). Thereafter, Flowers is motionless, at just under three minutes into the traffic stop. (*Id.* 02:50-03:00). The remaining one minute and 46 seconds depict Deputy Wilson pacing the scene. (*Id.* 03:00-4:45).

The LSP investigation report's "narrative" timeline of the RKM video footage provides essentially the same description of events set forth above. (*See* Doc. 86-7 pp. 1-2). Most relevant, it states that after opening the rear door Deputy Wilson reaches

---

[4] Defendants include a separate video file with their summary judgment evidence, titled "Incident Video: RKM Main_IP Camera16 and Authentication." (*See* Doc. 82-8 ¶ 2 (Attachment 6). This video is in "mp4" format, is not accessible to the Court, and is not considered here.

in "*appearing* to struggle"; that Flowers exited the Tahoe "with both arms *appearing* to move up"; and that "Flowers points what *appears* to be a firearm, using both hands, toward Dpy. Wilson" as he is rolling on the ground. (*Id.* (emphasis added)). Notably, these are the only instances when the LSP's narrative timeline employs speculative language—*i.e.*, "appearing" and "appears"—to describe events depicted in the video. (*Id.*).

In contrast to the ambiguous video footage, Deputy Wilson's testimony of what occurred during his 13-second encounter with Flowers is clear:

> Q.    So, now, we're at the point you say you were searching [the Tahoe] and you saw a leg. And at the point that you saw a leg, what happened next?
>
> A.    I stepped -- I exited the driver's side of the vehicle and I opened the back left passenger door, and that's where I made contact with Myron Flowers. I advised --
>
> Q.    Now, Mr. Flowers, where was he sitting?
>
> A.    Directly behind the driver.
>
> Q.    And as you made contact with Mr. Flowers, did you give him a command to get out of the vehicle at that point?
>
> A.    I did.
>
> Q.    And tell me what else happened.
>
> A.    I told him several times to get out of the vehicle. He didn't get out of the vehicle. I looked down at him and, on his left side, facing me, was the handle of a firearm. I reached to secure the firearm with my left hand. He grabbed my wrist with his left hand. And then, we struggled over the firearm. And I told him, don't do it, don't do this.
>
> So, then he put his right hand in his right pocket and went to pulling out an object and he was struggling to get it out. I disengaged him and created distance between both of us. As he turned toward me, a firearm came out of his right pocket and was coming up toward me, and I fired shots.

(Wilson Depo. pp. 36:22-37:23)

> Q.    And as you started firing as Mr. Flowers was exiting the vehicle, tell me what happened next.
>
> …
>
> A.    Whenever he got out -- whenever he was coming out of the vehicle and the shooting started, he fell to the ground. When he fell to the ground, I created more distance and the firearm was pointed -- then, pointed at me from him while he was laying on his side, and I fired my service weapon again.
>
> Q.    Now, was the firearm pointed at you?
>
> A.    Yes.
>
> Q.    Was the barrel of the firearm pointed at you?
>
> A.    Yes.
>
> Q.    As he was falling -- as Mr. Flowers was falling to the ground?
>
> A.    While he was on the ground.

(*Id.* pp. 41:23-42:16).

### B. Procedural History

Plaintiff initiated this wrongful death and survival action on April 9, 2020, pursuing various excessive-force related claims on behalf of Flowers' minor child, MFJ. (Doc. 1). The following claims remain after the Court's March 29, 2021 Order addressing Defendants' motions to dismiss: (1) constitutional individual capacity excessive force claims against Deputy Wilson and Sergeant Baudoin; (2) constitutional municipal liability (*Monell*) claims against the EFPSO and the Clinton PD; (3) Louisiana tort claims of excessive force, assault, battery, and negligence against Deputy Wilson and Sergeant Baudoin; and *respondeat superior* liability

claims against EFPSO and the Clinton PD. (Doc. 43).[5]

Now Deputy Wilson, the EFPSO, and the Clinton PD move for summary judgment. (Doc. 82, Doc. 86). Plaintiff opposes. (Doc. 93, Doc. 103).

## II.    LAW AND ANALYSIS

### A. Standard

Federal Rule of Civil Procedure ("Rule") 56(a) provides that the Court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> In considering a motion for summary judgment, the district court must view the evidence through the prism of the substantive evidentiary burden. All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. If the record, viewed in this light, could not lead a rational trier of fact to find for the nonmovant, summary judgment is proper. On the other hand, if the factfinder could reasonably find in the nonmovant's favor, then summary judgment is improper.
>
> Finally, even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that a better course would be to proceed to a full trial.

*Kunin v. Feofanov*, 69 F.3d 59, 61–62 (5th Cir. 1995) (quotation marks, alterations, and citations omitted); *see also Firman v. Life Ins. Co. of N. Am.*, 684 F.3d 533, 538 (5th Cir. 2012) (same); *accord Black v. J.I. Case Co.*, 22 F.3d 568, 572 (5th Cir. 1994) ("The Supreme Court has recognized that, even in the absence of a factual dispute, a district court has the power to 'deny summary judgment in a case where there is

---

[5] The Court's March 29 Order afforded Plaintiff the opportunity to amend her complaint as to certain dismissed claims. (Doc. 43 p. 18). Plaintiff elected not amend.

reason to believe that the better course would be to proceed to a full trial.'" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

Importantly, when conducting the summary judgment analysis, the Court is prohibited from evaluating the credibility of the witnesses, weighing the evidence, or resolving factual disputes. *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021). Put differently, the Court may *not* credit certain witness testimony over other evidence: "By choosing which testimony to credit and which to discard, a court improperly weighs the evidence and resolves disputed issues in favor of the moving party. Doing so is tantamount to making a credibility determination, and—at this summary judgment stage—a court may make no credibility determinations." *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 245 (5th Cir. 2016) (quotation marks, alterations, and citations omitted).

### B. Analysis

#### i. Excessive Force[6]

Deputy Wilson seeks dismissal of Plaintiff's excessive force claim, arguing that it cannot withstand a qualified immunity analysis. (Doc. 86-1 pp. 6-12).

The qualified immunity doctrine turns the traditional summary judgment burden on its head, requiring Plaintiff—the *non-moving* party—to "demonstrate the inapplicability of the defense."[7] *Rogers v. Jarrett*, 63 F.4th 971, 975 (5th Cir. 2023)

---

[6] Plaintiff pursues excessive force claims under the Fourth Amendment and the Louisiana Constitution. For all intents and purposes, this distinction is without difference. *See Kelly v. Stassi*, 587 F. Supp. 3d 409, 427 & n.130 (M.D. La. 2022) (Dick, C.J.) (citing authorities), *appeal dismissed*, 2022 WL 18923152 (5th Cir. Apr. 14, 2022). Accordingly, the following analysis applies equally to both claims.

[7] The qualified immunity defense remains "the law of the land." *Jamison v. McClendon*, 476

(quotation marks omitted). To meet her burden, Plaintiff must "(1) raise a fact dispute on whether [Flowers'] constitutional rights were violated by [Deputy Wilson's] conduct, and (2) show those rights were clearly established at the time of the violation." *Id.* (quotation marks omitted). Still, even when conducting a qualified immunity analysis, the Court views all evidence and makes all reasonable inferences in the light most favorable to Plaintiff. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

### a. Plaintiff has raised a fact dispute on whether Flowers' constitutional rights were violated

The Fourth Amendment prohibits an officer from using excessive or unreasonable force in the context of an arrest. *Graham v. Connor*, 490 U.S. 386, 394 (1989). To establish an excessive force violation, "a plaintiff must demonstrate (1) an injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was (3) objectively unreasonable." *Hutcheson v. Dallas Cnty., Texas*, 994 F.3d 477, 480 (5th Cir. 2021) (quotation marks omitted), *cert. denied*, 142 S. Ct. 564 (2021). "The second and third elements collapse into a single objective-reasonableness inquiry determined by the

---

F. Supp. 3d 386, 409 (S.D. Miss. 2020) (Reeves, J.) (reviewing the history and expansion of the qualified immunity doctrine, and calling for its elimination). But for how long? Scholars and at least one jurist of the U.S. Court of Appeals for the Fifth Circuit have recently called for its ouster because the doctrine is founded on a legal fiction derived from a reconstruction-era scrivener's error that removed a determinative 16-word clause from the published version of 42 U.S.C. § 1983. *See* Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 CAL. L. REV. 201 (2023). Restored to its proper place, this clause "unequivocally negate[s] the original interpretive premise for qualified immunity." *See Rogers v. Jarrett*, 63 F.4th 971, 979 (5th Cir. 2023) (Willett, J., concurring). It is not this Court's role to cast aside qualified immunity here, particularly absent any argument from the parties. Indeed, only the Supreme Court can definitively "overrule" the defense. *Id.* at 981. For now, the undersigned commends Professor Reinert's scholarship, and joins Judge Willett's call for the Supreme Court to "definitively grapple with § 1983's enacted text and decide whether it means what it says—and what, if anything, that means for § 1983 immunity jurisprudence." *Id.*

crime's severity, the suspect's threat, and whether the suspect is actively resisting arrest or trying to flee." *Id.* (quotation marks omitted).

"The threat-of-harm factor typically predominates the analysis when deadly force has been deployed." *Harmon v. City of Arlington, Texas*, 16 F.4th 1159, 1163 (5th Cir. 2021). The Fifth Circuit instructs that "an officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm to the officer or to others." *Id.* (quotation marks and alterations omitted). Put differently, "[t]he use of deadly force may be proper regardless of an officer's negligence if, at the moment of the shooting, he was trying to prevent serious injury or death." *Carnaby v. City of Houston*, 636 F.3d 183, 188 (5th Cir. 2011). Of course, the Court must "be cautious about second-guessing the police officer's assessment of the threat level." *Harmon*, 16 F.4th at 1163 (quotation marks and alterations omitted).

Here, the determinative question is solely whether Deputy Wilson could reasonably have believed that Flowers posed a serious threat of harm during the 13 second encounter beginning when Deputy Wilson opened the Tahoe's rear door, and ending when Flowers lay expiring in the RKM parking lot. The parties offer wildly divergent accounts of what occurred in this critical interval. If, as Deputy Wilson insists, Flowers disobeyed orders to get out of the Tahoe, displayed a firearm, attempted to prevent Deputy Wilson from "secur[ing] the firearm" in his left jacket pocket, and then "pulled a firearm out of his [right] pocket and pointed it at Dy. Wilson as [he] exited the vehicle," (Doc. 86-1 p. 10), then existing law compels a

conclusion that Deputy Wilson's deadly force was justified. *Cloud v. Stone*, 993 F.3d 379, 387 (5th Cir. 2021) ("Our precedent teaches that officers use lethal force justifiably if they reasonably believe the individual is reaching for a gun. We have adhered to this standard even in cases when officers had not yet seen a gun when they fired, or when no gun was ever found at the scene." (citation omitted)). If, on the other hand, Plaintiff is correct that "Flowers was quietly sitting in the back of the vehicle until Wilson ordered him to get out which [sic] he attempted to do when Wilson open [sic] fire on him," (Doc. 103-1 p. 13), then Plaintiff may yet prevail in her excessive force claim. *See Cloud*, 993 F.3d at 387 ("To show a triable issue, a plaintiff must generally present competent summary judgment evidence that the arrestee did not reach for what the officer reasonably perceived to be a weapon." (quotation marks and alterations omitted)).

The RKM video is the best evidence of what occurred in this critical 13-second interval. *Carnaby*, 636 F.3d at 187. Remarkably, each side supports its version of events by referencing this video. (*Compare* Doc. 86-1 p. 11, *with* Doc. 103-1 p. 13). Having viewed the video in real time, and even having paused at the precise intervals identified in Defendants' summary judgment papers, each side's version of events is plausible. Consistent with the LSP's narrative timeline, it *appears* that Deputy Wilson *was* struggling (with something) immediately after he opened the Tahoe's rear door. (*See* Doc. 86-7 p. 1). It also *appears* that Flowers *was* raising his hands when he exited the Tahoe. (*See id.*). It also *appears* that Flowers' hands *were* briefly drawn together *and* raised as he rolled over on the ground. (*See id.* p. 2). But it is impossible

to tell from the video alone what prompted Deputy Wilson's apparent struggle, whether Flowers did or did not have a weapon in his hands or on his person during this interval, or even where the two handguns later recovered from the RKM parking lot were located after Flowers collapsed.

In short, the video's depiction of events—which began as an investigation into a minor traffic infraction but escalated quickly to a fatal officer-involved shooting—is ambiguous. On the present record, the only way to resolve this ambiguity is to *credit* Deputy Wilson's deposition testimony, and to decide *the* material dispute at the heart of this case—*i.e.*, whether Deputy Wilson reasonably deployed deadly force. The Court is not permitted such liberties at summary judgment. *Heinsohn*, 832 F.3d at 245.

In sum, viewed one way the RKM video is competent summary judgment evidence supporting a determination that Flowers *was* raising his hands and was *not* reaching for or holding a weapon when he emerged from the Tahoe, and also was not pointing a weapon when he rolled on the ground. Viewed another, it supports a determination that Flowers struggled with Deputy Wilson, and may have reached for, brandished, or pointed a weapon. The result, for present purposes, is a genuine dispute of material fact as to whether Deputy Wilson deployed deadly force reasonably believing that Flowers was a serious threat. *See Cloud*, 993 F.3d at 387. Plaintiff has carried her burden at the first step of the qualified immunity analysis.

**b. Flowers' constitutional rights were clearly established at the time of the alleged violation**

This much *is* clear: it is objectively unreasonable for an officer to use deadly

16

force absent "probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 3 (1985); *see also Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 338 (5th Cir. 2020) ("*Tennessee v. Garner* prohibits the use of deadly force without an immediate threat and without a warning when one is feasible."). In other words, on the night he shot Flowers, Deputy Wilson unquestionably had "fair warning" that he could not use deadly force during a traffic stop for a minor infraction absent a significant threat from Flowers. *Hanks v. Rogers*, 853 F.3d 738, 747 (5th Cir. 2017) ("[A] an officer violates the Fourth Amendment if he abruptly resorts to overwhelming physical force rather than continuing verbal negotiations with an individual who poses no immediate threat or flight risk, who engages in, at most, passive resistance, and whom the officer stopped for a minor traffic violation." (citing authorities)). As above, whether Flowers posed a significant threat turns on a subjective interpretation of the RKM video, and a credibility determination regarding Deputy Wilson's account of what occurred in the RKM parking lot. Again, the Court is not permitted to make such findings at summary judgment. *Heinsohn*, 832 F.3d at 245. Plaintiff has also carried her burden to show that the law was clearly established at the time Deputy Wilson used deadly force against Flowers, and Deputy Wilson's qualified immunity defense fails.

In sum, Plaintiff has established a fact dispute on whether Deputy Wilson used excessive force when he shot Flowers, and that when Deputy Wilson discharged his service weapon the law clearly prohibited deadly force absent a significant threat. *See*

*Rogers*, 63 F.4th at 975. Deputy Wilson's qualified immunity defense fails. Plaintiff's excessive force claim will be submitted to the jury.[8]

### c. Punitive Damages

Deputy Wilson also seeks dismissal of Plaintiff's claim for punitive damages arising from his alleged use of excessive force. (Doc. 86-1 p. 18). "[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Here, again, an obvious factual dispute exists regarding what motivated Deputy Wilson to shoot Flowers. If Deputy Wilson's testimony is credited, then he fired his service weapon reasonably believing that Flowers posed a substantial threat, in which case there is no underlying constitutional violation *or* possibility of punitive damages. But, again, at this stage the Court cannot credit Deputy Wilson's testimony to resolve the ambiguity depicted in the RKM video. *Heinsohn*, 832 F.3d at 245. As such, whether Deputy Wilson acted with an evil motive or callous indifference to Flowers constitutional rights is also a jury determination, and the Court cannot dismiss Plaintiff's claim for punitive damages. *See Heaney v.*

---

[8] To be clear, the Court finds that Plaintiff has carried her burden to show that qualified immunity is inapplicable for present purposes. *See Rogers*, 63 F.4th at 975. Even if she had not, however, the Court would exercise its discretion "to proceed to a full trial" in this unique case. *Black*, 22 F.3d at 572 (quoting *Anderson*, 477 U.S. at 255. Simply put, a jury should decide how to interpret the events depicted in the RKM video and what weight to assign to Deputy Wilson's account, particularly given that Flowers *and* Sergeant Baudoin are *each* now deceased (and cannot speak for themselves), and the parties have inexplicably failed to provide a competent account of events from Kyle Bryant (the only other eye witness to the events of April 12, 2019). *See supra* n.3.

*Roberts*, 846 F.3d 795, 802-03 (5th Cir. 2017) (normal summary judgment rules apply to determinations of "improper motive" under the qualified immunity analysis (citing *Crawford-El v. Britton*, 523 U.S. 574, 585 (1998)); *accord Heaney v. Roberts*, 147 F. Supp. 3d 600, 609 n. 9 (E.D. La. 2015) (Zainey, J.) (explaining that no "special rule … protect[s] a defendant's right to qualified immunity in cases involving improper motivation—cases that would frequently involve a disputed issue of fact that would preclude summary adjudication.").

### ii. *Monell* Failure To Train

Plaintiff's remaining municipal liability claims seek damages from the EFPSO and the Clinton PD for failing to promulgate use of force policies, failing to train their officers in use of force, and failing to supervise/discipline their officers when excessive force is used. (*See* Doc. 43 p. 15).

"To establish *Monell* liability, a plaintiff must show that an official policy promulgated by a municipal policymaker was the moving force behind the violation of a constitutional right." *Henderson v. Harris Cnty., Texas*, 51 F.4th 125, 130 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 2661 (2023).

> A failure-to-train action is a type of *Monell* claim. To establish *Monell* liability on a failure-to-train theory, a plaintiff must prove that: (1) the city failed to train or supervise the officers involved; (2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and (3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights.

*Id.* (quotation marks and citations omitted).

### a. EFPSO

At the outset, the EFPSO asserts that Plaintiff's municipal liability claim must

be dismissed because her "underlying Fourth Amendment excessive force claim fails; thus, she has no underlying constitutional violation on which to base municipal liability." (Doc. 86-1 p. 16). This argument is a nonstarter. As set forth above, Plaintiff has raised a fact dispute regarding whether Deputy Wilson's deadly force violated Flowers' clearly established constitutional rights.

Next, EFPSO contends that it cannot be liable for failing to implement a use of force policy where the summary judgment record shows that, at the time of Flowers' death, EFPSO policy expressly prohibited EFPSO employees "from using unnecessary force or violence [or striking] a prisoner or any other person except in self-defense."(Sheriffs' SOF ¶¶ 36-37). Plaintiff offers no rebuttal. This aspect of Plaintiff's municipal liability claim will be dismissed.[9]

Finally, the EFPSO challenges each element of Plaintiff's failure to train claim, arguing that Plaintiff "fails on all three prongs." (*Id.* pp. 16-17). Here, the EFPSO simply ignores the competent summary judgment evidence. Plainly, Plaintiff has raised a fact dispute as to the first "prong"—whether the EFPSO failed to train Deputy Wilson on the use of excessive force—where Deputy Wilson testified that he did *not* receive *any* such training and faced no disciplinary action after the shooting. (Wilson Depo. pp. 16:16-23, 65:11-17). The same goes for the second "prong": obviously

---

[9] The fact that EFPSO actually maintained an excessive force policy at the time of Flowers death is not, of itself, determinative of Plaintiff's failure to train claim. Why? Because "[a]n unconstitutional failure to train is not the same as an unconstitutional failure to adopt policies; each is a distinct theory of *Monell* liability." *Buchicchio v. LeBlanc*, --- F.Supp.3d --- -, 2023 WL 2027809, at *14 (M.D. La. Feb. 15, 2023) (Jackson, J.) (citing authorities); *compare Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91 (1978) (establishing municipal liability for unlawful policies, practices, and customs), *with City of Canton, Ohio v. Harris*, 489 U.S. 378, 387-88 (1989) (establishing municipal liability for failure to train).

there is a causal connection between the EFPSO's alleged failure to train Deputy Wilson on use of excessive force and Deputy Wilson's deployment of deadly force against Flowers. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 n.10 (1989) ("[T]he need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." (citation omitted)). Finally, the third "prong"—deliberate indifference—is satisfied because this case arises from an officer-involved shooting, *precisely* the circumstances under which the Supreme Court holds that "there is an obvious need for some form of training." *Connick v. Thompson*, 563 U.S. 51, 64 (2011) ("Armed police must sometimes make split-second decisions with life-or-death consequences. There is no reason to assume that police academy applicants are familiar with the constitutional constraints on the use of deadly force. And, in the absence of training, there is no way for novice officers to obtain the legal knowledge they require. Under those circumstances there is an obvious need for some form of training."); *accord Pena v. City of Rio Grande City*, 879 F.3d 613, 624 (5th Cir. 2018) (discussing authorities).

In sum, a fact dispute exists as to whether the EFPSO's lack of training and discipline/supervision resulted in Deputy Wilson's unconstitutional deployment of deadly force against Flowers. This dispute must also be resolved by the jury.

### b. Clinton PD

The Clinton PD raises all the same defenses to Plaintiff's municipal liability claim as the EFPSO. (*See* Doc. 82-1 pp. 6-22). As above, the Clinton PD's argument that Plaintiff's municipal liability claim fails because she has not established an

underlying constitutional violation falls flat. (*See id.* pp. 6-19). Again, based on the RKM video, a factual dispute exists regarding whether Sergeant Baudoin's use of deadly force violated Flowers' clearly established constitutional rights.

By contrast, the Clinton PD's challenge to the evidence supporting the elements of Plaintiff's failure to train claim hits the mark. (*See id.* pp. 19-22). Specifically, the Clinton PD has produced competent evidence showing that it maintained an excessive force policy at the time of Flowers' death, that all officers were trained on this policy, and that Sergeant Baudoin was suspended (and ultimately resigned) as a result of his involvement in the shooting. (Town SOF ¶¶ 23, 24, 28; Doc. 82-6 p. 35:1-7). Plaintiff fails to controvert this evidence. As such, Plaintiff's municipal liability claim against the Clinton PD must be dismissed. *See Hutcheson*, 994 F.3d at 483 (a failure to train claim fails absent a competent showing that a police department failed to train its officers).

### iii.  Plaintiff's State Law Claims

Defendants concede that Plaintiff's Louisiana tort claims of excessive force, assault, and battery "are essentially state law corollaries of her § 1983 excessive force claim." (Doc. 86-1 pp. 20-21; *accord* Doc. 82-1 pp. 22-23). The same video evidence that creates a genuine dispute regarding Plaintiff's constitutional excessive force claim also establishes a genuine dispute as to these claims. *Deville v. Marcantel*, 567 F.3d 156, 173 (5th Cir. 2009) (reversing summary judgment to defendants on plaintiff's state-law excessive force/battery claim based on the same evidence that established a factual dispute as to plaintiff's constitutional excessive force claim).

This leaves only Plaintiff's negligence claim. Louisiana measures negligence

by the "duty-risk" framework, requiring Plaintiff to establish that (1) Flowers suffered an injury; (2) the Defendants owed him a duty of care; (3) the Defendants breached that duty; (4) the conduct in question was the cause-in-fact of the resulting harm; and (5) the risk of harm was within the scope of protection afforded by the duty breached. *Doe v. McKesson*, 2021-00929 (La. 3/25/22). Under Louisiana law "[a] police officer has a duty to act reasonably under the totality of the circumstances." *Elphage v. Gautreaux*, 969 F. Supp. 2d 493, 516 (M.D. La. 2013) (Dick, J.) (citing *Mathieu v. Imperial Toy Corp.*, 646 So.2d 318, 322–23 (La. 1994)).

Here, Defendants challenge *only* the duty element of Plaintiff's negligence claims, arguing that there is no genuine dispute that Deputy Wilson and Sergeant Baudoin acted reasonably under the circumstances. (*See* Doc. 82-1 p. 24; Doc. 86-1 p. 20). But again, whether Deputy Wilson and Sergeant Baudoin acted reasonably is dependent on a subjective interpretation of the RKM video, and a credibility determination regarding Deputy Wilson's account of what occurred in the moments after he opened the Tahoe's rear door. Such decisions cannot be made at summary judgment, and remain for the jury alone. *Heinsohn*, 832 F.3d at 245.

Finally, the EFPSO and the Clinton PD challenge Plaintiff's *respondeat superior* claims, solely on the basis that Plaintiff has not carried her burden to establish any actionable torts against Deputy Wilson and Sergeant Baudoin. (Doc. 82-1 p. 24; Doc. 86-1 p. 21). Having determined that Plaintiff's underlying tort claims survive summary judgment, it follows that Plaintiff's vicarious liability claims must also be decided by the jury.

### III.    CONCLUSION

Accordingly,

**IT IS ORDERED** that the Clinton PD's **Motion For Summary Judgment (Doc. 82)** be and is hereby **GRANTED IN PART**, and that Plaintiff's municipal liability claim against the Clinton PD be and is hereby **DISMISSED**. In all other respects, the Clinton PD's Motion is hereby **DENIED**.

**IT IS FURTHER ORDERED** that the Sheriff Defendants' **Motion For Summary Judgment (Doc. 86)** be and is hereby **GRANTED IN PART**, and that Plaintiff's municipal liability claim against the EFPSO be and is hereby **DISMISSED IN PART**, leaving for trial whether the EFPSO is liable under *Monell* for failing to train and supervise/discipline Deputy Wilson. In all other respects, the EFPSO's Motion is hereby **DENIED**.

**IT IS FURTHER ORDERED** that a telephone status conference be and is hereby **SET** for October 19, 2023 at 2:00 p.m. for the purpose of selecting a new trial date and related deadlines. Dial-in instructions will be emailed to counsel. Prior to the conference, counsel shall meet, confer, and select among the following four-day trial settings: February 26-29, 2024; March 19-22, 2024; and March 25-29, 2024.

Baton Rouge, Louisiana, this 28th day of September, 2023

**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

24